1   QUINN EMANUEL URQUHART & SULLIVAN, LLP
      Claude M. Stern (Bar No. 96737)
2     claudestern@quinnemanuel.com
      Karin Kramer (Bar No. 87346)
3     karinkramer@quinnemanuel.com
    555 Twin Dolphin Drive, 5th Floor
4   Redwood Shores, CA 94065-2139
    Telephone:    (650) 801-5000
5   Facsimile:    (650) 801-5100

6   PAUL HASTINGS LLP
      Bradford K. Newman (Bar No. 178902)
7     bradfordnewman@paulhastings.com
      Peter C. Meier (Bar No. 179019)
8     petermeier@paulhastings.com
    1117 S. California Avenue
9   Palo Alto, CA 94304-1106
    Telephone:    (650) 320-1800
10  Facsimile:    (650) 320-1900

11  Attorneys for Defendant/Counter-Claimant
    ZYNGA INC.

12                      UNITED STATES DISTRICT COURT

13                    NORTHERN DISTRICT OF CALIFORNIA

14

15
    ELECTRONIC ARTS INC.,                     CASE NO. CV 12 4099 SI
16
                        Plaintiff,            **ZYNGA INC.'S COUNTERCLAIM**
17                                            **AGAINST ELECTRONIC ARTS INC. FOR**
               vs.                            **BREACH OF CONTRACT AND**
18                                            **VIOLATION OF CALIFORNIA BUSINESS**
    ZYNGA INC.,                               **AND PROFESSIONS CODE SECTION**
19                                            **17200**
                        Defendant.
20

21  ZYNGA INC.,

22                      Counter-Claimant,

23             vs.

24  ELECTRONIC ARTS INC.,

25                      Counter-Defendant.

26

27                          **PUBLIC VERSION**

28
                                                   ZYNGA INC.'S COUNTERCLAIM
         Case No. CV 12 4099 SI

1

## **NATURE OF THE ACTION**

2        1.        Electronic Arts Inc. ("EA") claims that Zynga infringed its copyright by

3    "targeting and hiring away a number of high level executives from EA who had access to

4    highly sensitive, internal EA information about the development of *The Sims Social*."

5    Complaint, ¶53.  Not so.

6        2.        EA knows that none of the former EA executives it names in its lawsuit –

7    John Schappert, Jeff Karp, and Barry Cottle – transmitted any EA confidential information to

8    Zynga because EA itself was involved in, and approved of, the exhaustive measures

9    undertaken to ensure that did not happen.  In fact, EA entered into a settlement agreement that

10   released ██████████████████████████████████████████

11       3.        The truth is that despite years of trying to compete, and spending more than a

12   billion dollars on acquisitions, EA has not been able to successfully compete in the social

13   gaming space and was losing talent, particularly to social gaming leader Zynga.  Desperate to

14   stem this exodus, EA undertook an anti-competitive and unlawful scheme to stop Zynga from

15   hiring its employees and to restrain the mobility of EA employees in violation of the spirit of

16   the antitrust laws and California public policy.  EA sought, by threat of objectively and

17   subjectively baseless sham litigation, what it could never lawfully obtain from Zynga – a no-

18   hire agreement that would bar Zynga's hiring of EA employees.

19       4.        EA explicitly communicated to Zynga that, although Zynga's *past* hiring was

20   lawful, EA's Chief Executive Officer John Riccitiello was "on the war path," "incensed" and

21   "heated" and intent on stopping Zynga's *future* hiring of EA employees.  Mr. Riccitiello

22   lamented the fact that Zynga was able to attract his talent with better compensation packages

23   that EA just can't match and feared losing additional executives and looking bad to his Board

24   and shareholders.

25       5.        Zynga was told by EA's legal team that Mr. Riccitiello had instructed them to

26   obtain a no-hire agreement from Zynga that prohibited Zynga's future hiring of EA

27   employees.  Absent such agreement, Mr. Riccitiello would direct a lawsuit to be filed against

28   Zynga "knowing there was no basis and even though he loses."   Zynga was explicitly told

1   that Mr. Riccitiello aimed (a) to stop altogether or at least slow Zynga down from hiring "his

2   people"; (b) to make Zynga spend resources and money on meritless litigation; and (c) to

3   intimidate remaining EA employees and scare them from leaving.

4         6.     In California, it is well recognized that it is against the law for a company to

5   restrict its employees from going to work for a competitor.  It is equally established that,

6   circumstances such as these, competitors cannot agree amongst themselves to refrain from

7   hiring each other's employees without contravening the policy and spirit of the antitrust laws.

8   Notwithstanding the law, EA's specific objectives were to secretly restrict and chill a

9   competitor, increase market costs, impose a *de facto* non-compete on key talent unbeknownst

10  to the affected EA employees, and stifle innovation in social gaming – all without its conduct

11  ever coming to light.

12        7.     For more than a year, EA has acted unlawfully to fulfill its illicit goals of

13  restricting competition.  EA's threats of objectively and subjectively meritless sham litigation

14  have, in fact, caused the intended chilling effect. EA's conduct tampers with the employment

15  market and impairs the ability of its employees to seek better job opportunities within the

16  social gaming industry, and adversely impacts Zynga, as well as other industry competitors,

17  from lawfully competing for EA's employees.  This Counterclaim seeks relief for EA's

18  unlawful acts.

19                               **JURISDICTION AND VENUE**

20        8.     This Court has supplemental jurisdiction over these counterclaims under

21  23 U.S.C. § 1367 because the claims arise out of the same case or controversy that gave rise

22  to this action.

23        9.     Venue is proper in this judicial district because the actions at issue in these

24  counterclaims occurred within the jurisdiction of the United States District Court for the

25  Northern District of California.

26                                       **THE PARTIES**

27        10.     Zynga is a Delaware corporation and has its principal place of business in San

28  Francisco, California.

11.     EA is a Delaware corporation and has its principal place of business in Redwood City, California.

## FACTUAL ALLEGATIONS

I.     **EA'S CAMPAIGN TO CHILL THE MARKET ARISES OUT OF A FEAR OF NEW COMPETITION**

A.     **Zynga Emerges As The Leader Of The Social Gaming Industry**

12.     Zynga is the world's leading social gaming company.  Zynga makes and distributes a variety of online social games that are enjoyed by millions of players on the Internet, including more than 72 million Daily Active Users (DAUs) and 306 million Monthly Active Users (MAUs).  Founded in 2007, Zynga rapidly grew by capitalizing on the opportunity for social gaming on the world's most popular social networking sites.

13.     Zynga's hit games have included:

| Zynga Game | Launch/ Acquisition Date | Daily Users at peak (rounded) |
|---|---|---|
| *Farmville* | 2009 | 32.5 million |
| *CityVille* | 2010 | 21.5 million |
| *Zynga Poker* | 2007 | 15 million |
| *Mafia Wars* | 2008 | 10 million |
| *Words with Friends* | 2010 | 9 million |
| *DrawSomething* | 2012 | 9 million |
| *FrontierVille* | 2010 | 9 million |
| *CastleVille* | 2011 | 8.5 million |
| *Hidden Chronicles* | 2012 | 7.5 million |
| *FishVille* | 2009 | 7.5 million |
| *The Ville* | 2012 | 7 million |
| *Empires & Allies* | 2011 | 7 million |
| *Treasure Isle* | 2010 | 7 million |
| *PetVille* | 2009 | 7 million |
| *ChefVille* | 2012 | 7.2 million |
| *Bubble Safari* | 2012 | 6 million |
| *Adventure World* | 2011 | 5 million |
| *Pioneer Trail* | 2011 | 5 million |
| *Café World* | 2009 | 5 million |
| *Slingo* | 2012 | 4 million |

| YoVille | 2008 | 4 million |

Since 2009, Zynga has released 14 games that have been in the top ten online social games (as ranked on appdata.com).

**B.     EA Struggles To Evolve In The Transition From The Traditional Console Gaming Market Into The Social Gaming Market**

14.     EA has publicly acknowledged that it has failed to successfully compete in this new social gaming market led by Zynga.

15.     In May 2011, EA CEO John Riccitiello acknowledged that social gaming posed an "unbelievable change" and threat to EA:

> "I've had first-hand experience with failure, and I have had the opportunity to learn and recover from it. . . We were facing a world going through unbelievable change with the rise of smartphones, social networks, and more recently the iPad — each of which has turned out to be a platform where gaming is the No. 1 application. . .. ***Our profits were in rapid decline before they went entirely negative***. . . .  I wish I could tell you that it has all paid off.  That, like Truman, Jobs and Chambers, we have been fully vindicated.  Not yet.  Yes, we've had a few wins but there is much more to do."

*See* http://www.ea.com/news/john-riccitiello-to-grads-when-you-fail-fail-well (emphasis added).

16.     One year later, in a May 4, 2012 interview entitled: "*Riccitiello Hip to EA's Social Failings: 'I'd say we are a distant number two,*'" Mr. Riccitiello admitted:

> "'When it comes to Facebook, while we're number two, I'd say we're a distant number two.  I mean, the other guys have lapped us three times,' he said, referencing major social player Zynga."

*See* http://www.joystiq.com/2012/05/04/riccitiello-hip-to-eas-social-failings-id-say-were-a-distan/.

17.     EA's current attempts in litigation to portray Zynga's sustained record of innovation and success as achieved through copying are directly contradicted by Mr. Riccitiello's prior acknowledgment that Zynga has built its success on a great business model:

> "We're not going to knock down Zynga tomorrow — they've got a great business model — but we've got an opportunity to close that gap."

1   *See* Michael J. De La Merced, *In PopCap Deal, Electronic Arts Has Its Eyes On Zynga*,

2   DealB%k (July 12, 2011, 8:22 PM), http://dealbook.nytimes.com/2011/07/12/in-popcap-

3   deal-electronic-arts-has-its-eyes-on-zynga.

4
5   **C.    EA's Attempts To Reinvent Itself By Acquiring Social Gaming Companies Prove Unsuccessful**

6       18.    Despite years of trying, EA was unable to become a major player in the social

7   gaming space and turned to external talent in its attempt to reinvent itself.

8       19.    In 2009, EA purchased social game developer Playfish for $400 million.  Since

9   EA's acquisition, Playfish games have shed millions of users and lost their Top 10 status.  While

10  Playfish released two hit social games <u>prior</u> to EA's purchase of the company, since the 2009

11  acquisition, EA has released only one Top 10 social game.  Playfish (which has since adopted the

12  EA name) has now seen its DAUs decline to just under 9 million across 51 titles.

13      20.    After the Playfish acquisition failed to give EA a foothold, EA acquired another

14  social gaming company, PopCap.  The acquisition closed in August 2011, costing EA as much as

15  $1.3 billion.  While it generated a great deal of publicity, the acquisition has yet to generate any

16  significant benefit for EA.  In fact, it has recently been reported that EA laid off 50 PopCap

17  employees and has struggled to make the acquisition a success:

18
19          "Video game bellwether *Electronic Arts Inc.*'s (<u>EA</u>) unit PopCap Games has downsized its workforce by roughly 12% in the North American region.  EA had acquired the latter in July 2011.

20
21          According to Reuters, approximately 50 out of 380 employees from the Seattle and Vancouver studios have been laid off. Further, PopCap is looking into the feasibility of running its Dublin studio, which has a workforce of 90 employees.

22
23          EA had acquired PopCap Games to compete with *Zynga Inc.* (<u>ZNGA</u>) and expand in the rapidly evolving social and mobile gaming segments. The deal was valued at $1.3 billion...

24
25          EA's decision to restructure PopCap Games comes at a time when the company is witnessing a decline in its revenues and reporting losses on a year-over-year basis.  In the last concluded quarter, EA's loss widened from the year-ago quarter due to higher operating costs.  This is particularly painful in the video games market where retail sales have declined for eight straight months."

26
27
28  *See* http://finance.yahoo.com/news/eas-popcap-unit-reduces-workforce-171435540.html

1  II.  **FRUSTRATED BY ITS INABILITY TO COMPETE LAWFULLY IN THE NEW
2      SOCIAL GAMING WORLD, AND ITS LOSS OF TALENT TO COMPETITORS,
       EA SEEKS TO CHILL EMPLOYEE MOBILITY**

3      A.  **EA Loses Talent Across The Market**

4          21.  Between 2009 and 2011, it was common knowledge within industry circles that

5  EA was suffering from a "brain drain" of much of its historic visionary talent.

6          22.  In 2009, **Will Wright**, the founder of *The Sims*, departed from EA.  In

7  February 2011, two of Playfish's four principal founders – **Sebastian de Halleux** (Playfish's

8  Chief Operations Officer) and **Sami Lababidi** (head of Playfish's development operations)

9  departed from EA.  A third, **Shukri Shammas**, had already left in March 2010.

10         23.  In addition to the loss of Playfish's founders, EA suffered what industry

11 publications have noted was a "string of high-profile departures" between 2008 and 2012.  These

12 departures include:

13     - **Warren Jenson,** EA CFO**,** departs to join Take-Two Interactive
14     - **Neil Young**, Vice President and General Manager of EA Los Angeles, leaves to
         start his own independent game studio
15     - **Ben Cousins**, EA Easy Studio General Manager, joins Ngmoco
16     - **Scott Amos**, Visceral Games Executive Producer, leaves EA to join Crystal
         Dynamics
17     - **Ian Cummings** Madden NFL Creative Director, **Richard Wifall** EA Sports CTO,
         and **Philip Holt**, EA Tiburon GM leave to form Row Sham Bow, a new online
18       game studio
19     - **Heidi Newell**, EA Localization manager, leaves EA to join Babel Media
       - **Gordon Van Dyke,** Visceral Games Producer, leaves EA to join Paradox
20       Interactive
21     - **John Earner**, Vice President of Playfish London, leaves EA and is now with
         Space Ape Games
22     - **Eric Wood**, Senior Director of Business Development, leaves EA and is now with
         Disney Interactive
23     - **Reid Schneider**, EA Montreal Producer, leaves EA and is now at Warner Bros.
         Games Montreal
24     - **Adam Sussman**, Senior Vice President of Publishing, leaves EA for Disney
25       Games
       - **Mark Vange**, Chief Technical Officer, quits EA
26     - **Jason Willi,** COO for EA's Hasbro Business Unit, leaves EA for Booyah
27     - **Alain Tascan**, Vice President and General Manager EA Montreal, leaves for Sava
         Transmedia
28

Case No. CV 12 4099 SI                    -6-          ZYNGA INC.'S COUNTERCLAIM

- **Michael Marchetti**, Senior Vice President and General Manager for Social Games, leaves EA to join Buffalo Studios
- **Jon Rissik**, Vice President of Marketing, leaves EA and joins Codemasters.

**B.    As EA Talent Looks For Better Opportunities In the Social Gaming Industry, EA's CEO Becomes Singularly Focused on Stemming The Tide To Chief Competitor Zynga**

24.    During this time, the resurgence of Internet-based companies resulted in a highly competitive job market in Silicon Valley, as both emerging and established companies competed for top talent.  Nearby and high-profile up-and-comer Zynga became an obvious and attractive employment destination for EA talent.

25.    By 2010, social gaming was the newest form of gaming, and Zynga was one of the world's most innovative social gaming companies. The potential upside of joining a young, fast-growing, pre-IPO gaming company allowed Zynga to attract some of the top talent in the industry.

26.    By 2011, Zynga had received unsolicited job applications from 3,000 EA employees looking to join the hottest new game company.  EA employees from all levels expressed interest in joining Zynga, including many senior members of EA's executive team.

**C.    Then-EA Chief Operating Officer, John Schappert, Departs EA for Zynga**

27.    In early 2011, John Schappert – then EA's Chief Operating Officer – expressed a desire to join Zynga in a senior management role.  He made it clear that he was excited about joining Zynga prior to its IPO based on its success with innovating online social games and the growing market for social games.

28.    Mr. Schappert is a highly regarded, 18-year veteran of the video game industry.  In 1994, he founded Tiburon Entertainment, which is known for the highly successful *Madden Football* video game series, and which was later acquired by EA.  Mr. Schappert also served as Vice President of Xbox LIVE for Microsoft Corporation.  His wide range of experience in the industry, including building a company from the ground up, as well as his senior management experience at public companies, was attractive to Zynga as a pre-IPO company looking to expand its senior management.

-7-                ZYNGA INC.'S COUNTERCLAIM

29.     After learning that Mr. Schappert had expressed interest in joining Zynga and that Zynga had extended an offer of employment, EA CEO Mr. Riccitiello unsuccessfully applied enormous pressure on Mr. Schappert to try to get him to remain at EA.

30.     Zynga was confident that it had done nothing wrong in hiring Mr. Schappert.  As a precaution, it had undertaken exhaustive measures to ensure that Mr. Schappert brought no EA confidential information to Zynga, either purposefully or inadvertently.  These steps included (a) expressly telling Mr. Schappert that Zynga did not want any confidential information from EA and that he was prohibited from bringing to, using for or disclosing to Zynga any such data; (b) requiring Mr. Schappert to search for and escrow, destroy or return any EA material prior to starting his Zynga employment; (c) requiring Mr. Schappert to certify under oath to EA that he did not possess any EA data or documents; and (d) requiring Mr. Schappert to affirm under oath to Zynga that he did not possess any confidential data belonging to prior employers, and would not bring any such data to Zynga.

31.     Fully aware of the extensive measures Zynga had taken to ensure Mr. Schappert brought no confidential information to Zynga, EA nevertheless threatened to initiate high-profile, meritless, subjectively and objectively bad faith sham litigation against Zynga relating to its hiring of Mr. Schappert.  At this time, there were widespread rumors that Zynga was preparing to file for an initial public offering (IPO) – a particularly sensitive time for an emerging company.

32.     In order to protect Mr. Schappert and Zynga from EA's threats of objectively bad faith sham litigation in the run-up period to Zynga's IPO – Zynga took steps to appease EA and mitigate its risk.

33.     On April 4, 2011, Zynga entered into a ███████████ settlement agreement with EA that included a release ████████████.  *See* Confidential Exhibit A hereto.

34.     On May 4, 2011, EA executed a subsequent release ███████████████████ ██████  *See* Confidential Exhibit A hereto.

35.     At no point after May 4, 2011 and before filing its lawsuit for copyright infringement purportedly based on Mr.  Schappert's possession and disclosure of EA non-public data did EA raise any alleged dispute related to Mr. Schappert and EA data or avail itself of the

1    required mechanisms in <u>Confidential Exhibit</u> A.

2        **D.      Then-EA Executive Vice President for Play, Jeff Karp, Departs EA for Zynga**

3        36.      Jeff Karp first became interested in joining Zynga in Spring 2011, when he was

4    then-EA Executive Vice President for Play.  Like Mr. Schappert, Mr. Karp looked to Zynga and

5    saw the various monetary and professional opportunities associated with joining an exciting pre-

6    IPO company involved in reinventing gaming through social gameplay.

7        37.      Mr. Karp was an Executive Vice President at EA at the time of his departure.

8    Previously, he was CEO of Mevio Inc., and held executive positions with Wilson Sporting

9    Goods.

10       38.      In July 2011, Mr. Karp resigned from EA to join Zynga.

11       39.      As it had done with Mr. Schappert, Zynga undertook exhaustive measures to

12   ensure that Mr. Karp brought no EA confidential information to Zynga, either purposefully or

13   inadvertently.  These included (a) expressly telling Mr. Karp that Zynga did not want any

14   confidential information from EA and that he was prohibited from bringing to, using for or

15   disclosing to Zynga any such data; (b) requiring Mr. Karp to search for and escrow, destroy or

16   return any EA material prior to starting his Zynga employment; (c) requiring Mr. Karp to certify

17   under oath to EA that he did not possess any EA data or documents; and (d) requiring Mr. Karp to

18   affirm under oath to Zynga that he did not possess any confidential data belonging to prior

19   employers, and would not bring any such data to Zynga.

20       40.      In addition, to ensure no EA data was on his personal devices, Mr. Karp retained a

21   computer expert to examine and document all files on his EA computer and remove only his

22   personal files, and to examine and document all files on his personal computer and remove or

23   return to EA any EA files.  Mr. Karp also provided an EA in-house attorney with access to his

24   personal computer devices so that the EA attorney could examine them and confirm they

25   contained no EA data.  Following this inspection, EA did not claim that Mr. Karp was in

26   possession of any EA data or documents.

27

28

**E.     As EA Talent Looks For Better Opportunities At Zynga, EA's CEO Becomes Singularly Focused on Stemming The Loss Of Talent With Baseless Litigation Threats**

41.     Despite the fact that EA has lost talent to many other companies, Zynga is informed and believes that EA CEO Mr. Riccitiello became singularly focused on losing employee talent to Zynga.

42.     In July 2011, approximately three months after Zynga hired Mr. Schappert, Mr. Riccitiello emailed Mr. Schappert a warning about Zynga's recruitment and hiring of EA employees, plainly mischaracterizing EA's brain drain as being driven only by Zynga:

> "Some of our people will always leave. **But they are leaving for one place — Zynga**. … I get that they can reach out. The question is what happens when they do. **Listen and send them back to me, or their boss at EA.** Or, listen, nod and lend a hand…. **We are crossing into a place I don't think we want to be…** But I believe you can and should find more talent outside of EA."

43.     Zynga is informed and believes that EA was aware that Zynga filed its S-1 Registration Statement on July 1, 2011, initiating the IPO process, and of the pressure and public spotlight that the "going public" process puts on a young company.

44.     After Mr. Karp had joined Zynga, on July 29, 2011, EA's General Counsel gave Zynga's General Counsel a "heads up" that he would be sending "the usual letter" to Zynga regarding Mr. Karp, underscoring the lack of any specific concern on EA's part that Mr. Karp had left in possession of any EA data or done anything unlawful.

45.     Despite this "heads up," EA's General Counsel subsequently communicated to Zynga that EA wanted to meet with Zynga to discuss "resolving" "issues" specifically related to Zynga's hiring of Mr. Karp.   Zynga was confident that it had done nothing wrong given the exhaustive measures it had undertaken to ensure the proper recruitment and hiring of Mr. Karp and EA's knowledge of and involvement in those precautionary steps.  Wanting to address any potential issue and to avoid meritless and expensive litigation in the form of a legal shakedown by EA, Zynga nonetheless agreed to meet with EA.

46.     Once EA had lured Zynga to meet under the guise of addressing the *past* hiring of Mr. Karp, EA revealed its true strategy: to threaten Zynga with objectively and subjectively

1   baseless sham litigation if it hired any more EA employees in the *future*.

2          47.    EA communicated that there in fact was no actual or perceived unlawful act by

3   Zynga in connection with its recruitment and hire of Mr. Karp.  Indeed, EA's General Counsel

4   communicated that both he and his legal staff shared the professional opinion that Zynga's

5   recruitment and hiring of Mr. Karp was lawful, and that based on the facts of Zynga's recruitment

6   and hiring of both Mr. Schappert and Mr. Karp – and California's public policy in favor of

7   employee mobility – they had advised EA CEO Mr. Riccitiello that EA had no legal claims

8   against Zynga related to those hirings.

9          48.    EA's General Counsel explained that what really was at issue was Zynga's *future*

10  hiring of EA executives.  According to EA's General Counsel, Mr. Riccitiello was "on the war

11  path," "incensed" and  "heated" because he was fearful of losing additional executives to Zynga,

12  making him look bad to his Board and shareholders.  Mr. Riccitiello lamented the fact that Zynga

13  was able to attract his talent with better compensation packages that EA just can't match.  Among

14  other things, EA's General Counsel said:  "I have to get Zynga's agreement not to hire any more

15  EA employees or John is going to make me sue you."

16         49.    Subsequently, Zynga was again told that Mr. Riccitiello had instructed EA's legal

17  team to obtain – under threat of objectively and subjectively meritless sham litigation – broad-

18  based concessions from Zynga that would prohibit Zynga's future recruiting and hiring of EA

19  employees.  Absent such concessions, it was communicated that EA would sue Zynga at Mr.

20  Riccitiello's direction, "knowing there was no basis and even though he loses."  It was

21  communicated that Mr. Riccitiello's stated go-forward goals were:

22           &bull;   to stop or dramatically slow Zynga down from hiring "his people" by "putting

23               friction in your hiring system";

24           &bull;   to "make Zynga spend money" responding to objectively baseless sham

25               litigation if it tried to recruit and hire;

26           &bull;    "to scare" remaining EA employees into remaining with EA.

27         50.    It was explicitly stated that EA's tactics were completely unrelated to the propriety

28  of Zynga's past recruitment and hiring of Messrs. Schappert and/or Karp.  Instead, it was

1  singularly focused on chilling and restraining employee mobility and securing an ill-gotten and

2  unlawful advantage over its competitor Zynga with threats of bad faith and objectively and

3  subjectively baseless sham litigation.

4       51.    Zynga properly viewed EA's demands as illegal, anti-competitive and unfair and

5  refused to agree to broad-based prohibitions against future hiring of EA employees.

6       52.    Zynga also recognized that meritless litigation would have EA's intended effect of

7  chilling EA employees' mobility and disrupting Zynga's recruiting and hiring efforts, particularly

8  in the run-up to its IPO.

9       53.    Even though Zynga was confident that it had done nothing wrong, Zynga agreed to

10  enter into a settlement agreement that ███████████████████████████████████

11  ███████████████████████████████████████████████████████ included a release

12  of claims ████████████████████████████████████ *See* Confidential

13  Exhibit B.   At all times, Zynga refused to agree to EA's demands that it cease hiring EA

14  employees.

15      **F.**    **EA Executive Vice President, Barry Cottle, Departs EA for Zynga, Leading**

16                 **EA To Escalate Its Threats Of Baseless Litigation**

17       54.    For decades, Zynga's General Counsel has been personal friends with Barry

18  Cottle, and they have discussed the potential for working together at some point in their careers –

19  both before and during the times they were at Zynga and EA, respectively.

20       55.    Mr. Cottle was the Executive Vice President at Electronic Arts Interactive from

21  2007 to 2012.  Prior to EA, Mr. Cottle served as the founder and CEO of Quickoffice Inc., which

22  was acquired by Google.  He also served as COO and Chief Internet Officer for the Mobile

23  Content and Wireless Service business of Palm Computing Inc., and spent nine years with The

24  Walt Disney Company.

25       56.    In 2011, Mr. Cottle was EA Interactive Executive Vice President.  By May 2011,

26  Mr. Cottle was in discussions with Zynga about potential employment.

27       57.    Mr. Cottle decided to leave EA to join Zynga in January 2012.

28       58.    As it had done with Messrs. Schappert and Karp, Zynga undertook exhaustive

1    measures to ensure that Mr. Cottle brought no EA confidential information to Zynga, either

2    purposefully or inadvertently. These included (a) expressly telling Mr. Cottle that Zynga did not

3    want any confidential information from EA and that he was prohibited from bringing to, using for

4    or disclosing to Zynga any such data; (b) requiring Mr. Cottle to search for and escrow, destroy or

5    return any EA material prior to starting his Zynga employment; (c) requiring Mr. Cottle to certify

6    under oath to EA that he did not possess any EA data or documents; and (d) requiring Mr. Cottle

7    to affirm under oath to Zynga that he did not possess any confidential data belonging to prior

8    employers, and would not bring any such data to Zynga.

9          59.     Upon learning of Mr. Cottle's decision, on January 11, 2012, EA CEO

10    Mr. Riccitiello refused to accept Mr. Cottle's resignation and, despite EA now claiming that

11    Zynga hired Mr. Cottle to gain access to sensitive EA data, refused to accept Mr. Cottle's return

12    of his EA computer. Mr. Cottle therefore deposited his EA equipment with his personal attorney

13    to protect it until EA desired to reclaim it.

14          60.     Mr. Riccitiello's conduct then turned threatening. Mr. Riccitiello stated, among

15    other things, that if Mr. Cottle reported back to work at EA, he would "pretend none of this ever

16    happened," but if not, he would "rain hell" on Mr. Cottle for the next several weeks even though

17    Mr. Cottle had not engaged in any unlawful activity.

18          61.     Mr. Cottle responded to Mr. Riccitiello's threats:

19          "John, I have enjoyed a stellar reputation for decades, and yours is not
the first company I have left to accept what I believe to be a better

20          opportunity. I have done absolutely nothing wrong. **If you think I
have done anything unlawful in going to work for Zynga, I would**

21          **really like to understand what you think I did. Threatening to
retaliate against me with legal actions because I made a personal**

22          **decision to resign from EA doesn't make sense.**"

23    Neither Mr. Riccitiello nor EA ever identified any alleged unlawful conduct by Mr. Cottle.

24          62.     Immediately after Mr. Cottle gave notice, Zynga reached out to EA's General

25    Counsel, assuring him that Zynga was voluntarily taking extraordinary measures to ensure that

26    any EA data was protected from disclosure. Zynga was transparent with EA regarding those

27    steps, and EA did not object and in fact agreed with them. Zynga informed EA that Mr. Cottle

28    had retained his own counsel to guide him in that departure and had also retained forensic experts

1    to ensure that all EA materials, documents and property were identified, isolated, protected from

2    disclosure and returned to EA.  Zynga's General Counsel also invited EA to surface any concerns

3    it may have – other than the mere fact that Mr. Cottle had joined Zynga.

4           63.    On January 26, 2012, EA's attorneys accepted Mr. Cottle's invitation to allow a

5    voluntary inspection of all of his personal computing devices to ensure they did not contain

6    confidential EA data.   As a result of this inspection, EA knows that Mr. Cottle did not retain, use

7    or disclose any EA data.

8           64.    EA nevertheless once again demanded to meet, purportedly to resolve unspecified

9    "claims" relating to Zynga's recruitment and hire of Mr. Cottle.   Once again, when Zynga agreed

10   to hear EA out, EA told Zynga that EA knew it had no legal claims relating to Mr. Cottle's hiring

11   since Zynga "did it right."

12          65.    EA's General Counsel communicated to Zynga that Mr. Cottle's departure had

13   intensified EA's concern about losing talent to competitors and increased Mr. Riccitiello's wrath

14   toward Zynga by again making him look bad to his Board, shareholders and the gaming

15   community.  Mr. Riccitiello was aware there was widespread dissatisfaction among his key talent,

16   and that many of his executives were likely looking around and particularly interested in

17   exploring opportunities with Zynga.  Mr. Riccitiello was adamant about shutting down Zynga's

18   ability to hire any more of his employees.   Mr. Riccitiello was placing "extraordinary pressure"

19   on the EA legal team to finally obtain a go-forward no-hire agreement – unrelated to Zynga's

20   hiring of Mr. Cottle – that would prohibit Zynga's future ability to hire EA employees.  If Zynga

21   refused to agree to the no-hire, then Mr. Riccitiello wanted Zynga to know he would file an

22   objectively and subjectively baseless sham lawsuit against Zynga for the express purpose of

23   chilling Zynga's future hiring of EA employees and discouraging EA employees from seeking out

24   or accepting employment with Zynga.

25          66.    EA's objectively and subjectively bad faith conduct and meritless threats were

26   made outside the context of mediation and constitute admissible evidence.

27

28

**G.** **EA's Anticompetitive And Illegal Campaign To Halt Employee Mobility Has Harmed Both EA Employees, Zynga, And The Social Gaming Market**

67. As a direct result of EA's anticompetitive and illegal campaign to stop the flow of talent, both EA employees and Zynga have suffered harm.

68. Zynga has been forced to incur specific and additional monetary expenses in connection with its lawful recruiting and hiring of EA executives that would otherwise have been unnecessary. EA's conduct unfairly increases the cost of recruiting and hiring talent in the social gaming market.

69. Zynga was further deprived of a fundamental right to lawfully recruit and hire EA executives without fear of facing objectively and subjectively bad faith sham litigation.

70. Zynga in fact delayed hiring EA employees, and refrained from hiring others, in response to EA's illegal conduct.

71. EA's misconduct restricted the pool of qualified candidates in the social gaming space and limited the ability to compete for qualified employees.

72. All of these harms were the specifically intended result of EA's illegal scheme.

**FIRST CLAIM FOR RELIEF**
**(BREACH OF CONTRACT)**

73. Zynga realleges and incorporates by reference paragraphs 1 through 72 above.

74. On or about April 4, 2011, EA and Zynga entered into the April 2011 Settlement Agreement, a true and correct copy of which is attached as Confidential Exhibit A.

75. On or about May 4, 2011, EA and Zynga executed the "Exhibit A" to the April 2011 Settlement Agreement, a true and correct copy of which is attached as Confidential Exhibit A.

76. On or about September 21, 2011, EA and Zynga executed a confidential settlement agreement, a true and correct copy of which is attached to as Confidential Exhibit B.

77. The agreements EA and Zynga entered into constitute valid, binding and enforceable contracts that, among other things, released

Case No. CV 12 4099 SI                           -15-          ZYNGA INC.'S COUNTERCLAIM

1

2   78.   Zynga has performed (or was excused from performing) all of its obligations under

3   such contracts.

4   79.   EA breached its obligations to Zynga by:

5   (a)

6

7

8



9   80.   and to the extent not already released,

10

11

12

13   81.   EA has further released and waived

14

15   82.   As a proximate result of EA's breaches of contract, Zynga has suffered, and will

16   continue to suffer, general and special damages in an amount to be proven at trial.  Zynga seeks

17   compensation for all damages and losses proximately caused by these breaches.

18   **SECOND CLAIM FOR RELIEF**
**(VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS CODE**
19   **SECTION §17200, *et seq.*)**

20   83.   Zynga realleges and incorporates by reference paragraphs 1 through 82 above.

21   84.   The Unfair Competition Law ("UCL"), California Business & Professions Code

22   §17200 *et seq*., prohibits unfair competition in the form of any unlawful, unfair or fraudulent

23   business acts or practices.  California Business and Professions Code §17204 allows an entity

24   injured by such acts or practices to prosecute a civil action for violation of the UCL.

25   85.   EA has utilized, and continues to utilize, explicit bad-faith threats of admittedly

26   objectively and subjectively meritless and baseless sham litigation against Zynga for the

27   expressed purpose of creating an anti-competitive result that seeks to:

28

|     |     |                                                                                          |
|-----|-----|------------------------------------------------------------------------------------------|
| 1   | (a) | stifle competition in California by forcing Zynga (the market share                       |
| 2   |     | leader in social gaming) to refrain from hiring employees of EA (the                      |
| 3   |     | second largest market share holder in social gaming) and subject Zynga                    |
| 4   |     | and EA employees to a *de facto* non-compete over EA employees in                         |
| 5   |     | violation of California Business & Professions Code section 16600;                         |
| 6   | (b) | slow and prevent the departure of EA employees who seek employment                        |
| 7   |     | with Zynga, including by threatening and severely penalizing those who                    |
| 8   |     | do; and                                                                                   |
| 9   | (c) | force Zynga to expend unnecessary resources in response to EA's                           |
| 10  |     | admittedly objectively and subjectively unlawful threats.                                 |

86. When EA threatened to sue Zynga if it did not refrain from the future recruitment and hiring of EA employees, EA knew and expressed its understanding and intention to Zynga that such litigation would have no basis in law or fact. The facts and circumstances which rendered the threatened sham litigation against Zynga both subjectively and objectively meritless, and which EA knew at the time of such threats, include but are not limited to the acts complained of above.

87. Zynga was the direct and intended object of EA's anti-competitive conduct.

88. As a proximate result of EA's actions:

|     |     |                                                                                          |
|-----|-----|------------------------------------------------------------------------------------------|
| (a) |     | Zynga refrained from hiring certain EA executives seeking employment                      |
|     |     | at Zynga;                                                                                 |
| (b) |     | EA reduced Zynga's ability to compete for qualified employees;                            |
| (c) |     | EA disrupted the normal price-setting mechanisms in the marketplace                       |
|     |     | that apply in the labor setting by forcing Zynga to pay more to recruit                   |
|     |     | and hire EA employees; and                                                                |
| (d) |     | EA restricted the pool of qualified candidates in the social gaming space,                |
|     |     | thereby increasing the cost to Zynga of hiring other employees.                           |

89. Because Zynga and EA are the two largest companies in the social gaming industry and collectively comprise a material portion of the market share of social games played

1    on Facebook, EA's conduct has and continues to threaten an incipient violation of antitrust laws,

2    and/or violates the policy or spirit of those laws because its effect is comparable to and the same

3    as a violation of the antitrust laws, and otherwise significantly threatens and harms competition.

4          90.   EA's conduct in restricting Zynga's ability to hire its employees and preventing its

5    employees from leaving their employment with EA for a competitor created a *de facto* non-

6    compete that constitutes unlawful and unfair business practices in violation of California Business

7    and Professions Code sections 16600 *et seq*. and 17200 *et seq*.  EA's conduct tampers with the

8    employment market and impairs the ability of its employees to seek better job opportunities

9    within the social gaming industry, and adversely impacts Zynga, as well as other industry

10   competitors, from lawfully competing for EA's employees.

11         91.   Zynga's success in this action will enforce important rights affecting the public

12   interest.  There is a financial burden involved in pursuing this action, the action is seeking to

13   vindicate a public right, and it would be against the interests of justice to penalize Zynga by

14   forcing it to pay its own attorneys' fees from the recovery in this action. Attorneys' fees are

15   appropriate pursuant to Code of Civil Procedure §1021.5 and otherwise.

16         92.   The gravity of the consequences of EA's conduct as described above outweighs

17   any justification, motive or reason therefor, particularly considering the available legal

18   alternatives that exist in the marketplace.

19         93.   As a direct and proximate result of EA's unlawful and unfair business practices,

20   Zynga has suffered an injury in fact, and has lost money and/or property within the meaning of

21   California Business and Professions Code sections 17203 and 17204, including being forced to

22   unnecessarily incur additional costs to lawfully recruit and hire EA employees and by having to

23   expend funds to combat EA's unlawful conduct.  Zynga has been further injured because EA's

24   actions unduly burden its exercise of a fundamental liberty in California and have increased the

25   risk and costs of employing California residents in their chosen profession.

26         94.   Pursuant to California Business and Professions Code sections 17203 and 17204,

27   Zynga is entitled to injunctive relief enjoining EA, and individuals and entities acting in concert

28   with them, from engaging in further conduct constituting unfair competition designed to further

stifle competition in the marketplace.  Zynga requests an entry of a preliminary and permanent injunction:

(a)   prohibiting EA from threatening objectively and subjectively baseless sham litigation against Zynga with the expressed intent to interfere with the competitors' right to recruit, hire and/or employ EA employees, or thereafter initiating such litigation;

(b)   prohibiting EA from threatening litigation against its own employees with the expressed intent to dissuade them from pursuing or accepting employment with Zynga, or thereafter initiating such litigation;

(c)   prohibiting EA from interfering with Zynga's business relations with potential and actual employees in violation of California's Unfair Competition Law and public policy against restraints of trade including no-hire restrictions;

(d)   requiring EA to affirmatively notify its employees of their rights to seek employment with a competitor in the State of California, free of threat, coercion and/or objectively and subjectively baseless sham litigation; and

(e)   requiring EA to provide the Court with quarterly sworn certifications of compliance.

## PRAYER FOR RELIEF

WHEREFORE, Zynga prays for judgment as follows:

1.   Pursuant to its first cause of action, for general and special damages in an amount to be proven at trial;

2.   Pursuant to its second cause of action, for preliminary and permanent injunctive relief:

(a)   prohibiting EA from threatening objectively and subjectively baseless sham litigation against Zynga with the expressed intent to interfere with the competitors' right to recruit, hire and/or employ EA employees, or thereafter initiating such litigation;

(b)   prohibiting EA from threatening litigation against its own employees with the expressed intent to dissuade them from pursuing or accepting employment with Zynga, or thereafter initiating such litigation;

(c)   prohibiting EA from interfering with Zynga's business relations with potential and actual employees in violation of California's Unfair Competition Law and public policy against restraints of trade including no-hire restrictions;

(d)   requiring EA to affirmatively notify its employees of their rights to seek employment with a competitor in the State of California, free of threat,

coercion and/or objectively and subjectively baseless sham litigation; and

      (e)    requiring EA to provide the Court with quarterly sworn certifications of compliance.

4.     Pre-judgment and post-judgment interest at the maximum rate allowed by law;

5.     Attorneys' fees and costs; and

6.     For such other and further relief as the Court may deem proper.

DATED:  September 14, 2012         QUINN EMANUEL URQUHART & SULLIVAN
Claude M. Stern
Karin Kramer

PAUL HASTINGS LLP
Bradford K. Newman
Peter C. Meier


By: _____ /s/ Claude M. Stern _____


Attorneys for Defendant/Counter-Claimant
Zynga Inc.

-20-    ZYNGA INC.'S COUNTERCLAIM

1

**ECF ATTESTATION**

2          I, Timothy A. Butler, am the ECF User whose ID and Password are being used to file this:

3    ZYNGA INC.'S COUNTERCLAIM AGAINST ELECTRONIC ARTS INC. FOR BREACH OF

4    CONTRACT AND VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE

5    SECTION 17200.  In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that Claude M.

6    Stern has concurred in this filing.

7

8    Dated:  September 14, 2012                QUINN EMANUEL URQUHART &
                                               SULLIVAN, LLP

9

10                                             By:   */s/ Timothy A. Butler*                          

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28